**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY W. HART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| HAROLD B. WALLIS, JR., | ) | |
| President & CEO | ) | |
| **Serve:** 8622 Belladonna Dr. | ) | |
| College Grove, TN 37046-1450 | ) | |
| | ) | |
| ROBERT J. BOYICH, | ) | |
| Secretary | ) | |
| **Serve:**  907 Matthew Court | ) | |
| Walnut Creek, CA 94596-5469 | ) | |
| | ) | |
| LARRY M. FOLTZ, | ) | CASE NO.:  4:20-cv-00552 |
| **Serve:**  16 Blackwolf Run Ct. | ) | |
| Wildwood, MO 63040 | ) | |
| | ) | |
| JOHN T. BICKEL, JR., | ) | |
| **Serve:**  75 W. Glenwood Lane | ) | |
| Kirkwood, MO 63122 | ) | |
| | ) | |
| A.  HUNTER LEGEAR, | ) | |
| **Serve**:  828 Doerwood Ct. | ) | |
| Kirkwood, MO 63122 | ) | |
| | ) | |
| DUANE G. TROWER, | ) | |
| **Serve:**  14 Fox Meadows Lane | ) | |
| St. Louis, MO 63127 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| CPC LOGISTICS, INC. | ) | |
| **Serve**:  14528 S. Outer 40 Drive, Ste. 210 | ) | |
| Chesterfield, MO 63040 | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED COMPLAINT
FOR DERIVATIVE, INJUNCTIVE, AND OTHER RELIEF**

Plaintiff, for his Verified Complaint for Derivative, Injunctive, and Other Relief ("Complaint") against Defendants, states:

## INTRODUCTION

1.      Defendant CPC Logistics, Inc. ("CPC") is in the business of providing drivers, logistics personnel, and related services on a temporary or permanent basis in the transportation industry to transportation companies and companies with integrated trucking operations.

2.      In July 2004, CPC acquired its largest competitor, Manpower, Inc.'s subsidiary Transpersonnel, Inc. ("TPI").  As an essential part of the TPI acquisition, CPC conditioned the deal on CPC's hiring of Plaintiff, Jeffrey W. Hart ("Hart"), TPI's President.  Hart was highly successful in the market for transportation personnel management services and had built a highly profitable company at TPI.

3.      Hart was Manpower's youngest subsidiary president, with four promotions in his first six years at Manpower.  Hart gave up significant financial security and benefits to join CPC based on CPC shareholder, director, and officer representations made to him to induce Hart to come to CPC. To accept a position with CPC, Hart had to give up thousands of stock options for Manpower, Inc., which has since doubled its revenue, making its stock much more valuable, as well as other financial security benefits.

4.      Hart directed Manpower, Inc. to sell TPI to CPC rather than CPC's competitor Transforce, Inc.   Hart was instrumental in getting the TPI-CPC deal done and enhancing CPC's revenues and net profits by millions of dollars.

5.      Since that time, Defendants, and others acting in concert with them, have acted to deny Hart specific rights to participate in equity ownership of CPC, breached written and verbal

agreements related to minority and majority stock ownership, and now breached a Shareholder Agreement, defined below, among the parties.

6.      Defendants' actions have breached the Shareholder Agreement, specifically identified below, and breached fiduciary duties of candor, honesty, full disclosure, loyalty, fairness, and good faith, among other duties they owe to Hart.  Further, Defendants have fraudulently induced and conspired to coerce Hart to give up material contractual and employment agreement rights, alternative business opportunities, and misrepresented and failed and omitted to disclose material facts they had a duty to disclose.

7.      Now, in violation of the Shareholder Agreement, Defendants seek to oppress Hart as a minority shareholder by threatening to dilute his shares through self-serving stock transactions secretly orchestrated among them to enrich themselves at Hart's expense.

8.      Defendants engaged in the conduct alleged in this Complaint, to exclude Hart from his rightful position as a shareholder, and in violation of their fiduciary duties to Hart and in breach of the Shareholder Agreement.  Defendants have arranged stock transactions, set to occur on or about April 27, 2020, that threaten immediate and irreparable injury to Hart, for which there is no adequate remedy at law, absent intervention of the Court.

9.      This action seeks temporary and preliminary injunctive relief to maintain the status quo, permanent injunctive relief, derivative relief in accordance with Rule 23.1, Fed. R. Civ. P., and alternative monetary damages on behalf of Hart.

10.     Hart seeks derivative relief as a shareholder of CPC, and Hart seeks individual redress for the specific direct injuries caused to him by Defendants' conduct as more specifically alleged below.

## PARTIES

11.     Plaintiff Jeffrey W. Hart ("Hart") is a citizen of the State of Wisconsin, residing at 1624 Swallow Drive, Grafton WI 53024, Ozaukee County, Wisconsin.

12.     Defendant Harold B. Wallis ("Wallis") is a resident of Tennessee, residing at 8622 Belladonna Dr., College Grove, TN 37046-1450.  Wallis was an officer, and later President/CEO, director, minority shareholder, and then part of a majority shareholder group in senior management of CPC.

13.      Defendant Robert J. Boyich ("Boyich") is a resident of California, residing at 907 Matthew Court, Walnut Creek, CA 94596-5469.   Boyich was an officer, and later director, Executive Vice-President & Secretary, minority shareholder, and then part of a majority shareholder group in senior management of CPC.

14.     Defendant Larry M. Foltz ("Foltz") is a resident of St. Louis County, Missouri, residing at 16 Blackwolf Run Court, Wildwood, MO 63040-1570.  Foltz is a retired officer and director, and was part of a majority shareholder group in senior management of CPC.

15.     Defendant John T. Bickel, Jr. ("Bickel Jr.") is a resident of St. Louis County, Missouri, residing at 75 W. Glenwood Lane, Kirkwood, MO 63122.  At all relevant times, Bickel Jr. was a minority shareholder of CPC.   Bickel Jr. is the son of John T. Bickel, Sr. ("Bickel Sr."), a former majority shareholder, director, and officer (President) of CPC.

16.     Defendant A. Hunter LeGear ("A.H. LeGear") is a resident of St. Louis County, Missouri, residing at 828 Doerwood Court, Kirkwood, MO 63122.  At all relevant times, A. H. LeGear was a minority shareholder of CPC.  A.H. LeGear is the son of Daniel H. LeGear ("D. LeGear"), a former majority shareholder, director, and officer (Vice-President) of CPC.

17.     Defendant Duane G. Trower ("Trower") is a resident of St. Louis County, Missouri, residing at 14 Fox Meadows Lane, St. Louis, MO 63127.  At all relevant times, Trower was a minority shareholder and officer of CPC.

18.     Defendants Bickel, Jr., A.H. LeGear, and Trower became officers of CPC years after Hart joined CPC as Vice-President Sales, an officer of the company.

19.     Defendant CPC Logistics, Inc. ("CPC") is a Missouri Corporation with its principal place of business in St. Louis County, Missouri, at 14528 S. Outer 40 Drive, Suite 210, Chesterfield, MO 63040.

20.     Defendants Wallis, Boyich, and Foltz are collectively referred to as the "Selling Shareholder Defendants."

21.     Defendants Bickel, Jr., A.H. LeGear, and Trower are collectively referred to as the "Buying Shareholder Defendants."

## JURISDICTION AND VENUE

22.     The citizenship of the parties is diverse and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a) (1).  This Court has subject matter jurisdiction and Defendants are each subject to personal jurisdiction in this District because they reside and/or maintain their principal place of business and/or transacted business or entered into contracts in St. Louis County, Missouri and because the alleged transactions and occurrences referred to in the petition and Defendants' conduct occurred, in whole or in part, within this District.  Further, as alleged in this Complaint, Defendants committed tortious acts with foreseeable harm in this District and are subject to long-arm jurisdiction pursuant to Mo. Rev. Stat. §§ 351.633 and 506.500.

23.     A substantial part of the events and omissions giving rise to this Complaint arose and the property that is the subject of this action is situated in this District.  Accordingly, venue is proper in this District under 28 U.S.C. § 1391(b) (2) & (3).

## FACTS COMMON TO ALL COUNTS

24.     Defendant CPC Logistics, Inc. ("CPC") is a closely-held corporation.  CPC is in the business of providing outsourced employees, particularly in the commercial trucking segment, including drivers, logistics personnel, and electronic logistics technology on a temporary or permanent basis in the transportation industry to common carriers, customer-owned truck fleets, and dedicated carriers that provide trucks, trailers, and drivers to companies on a contract basis.

25.     In July 2004, CPC acquired its' largest competitor, Manpower, Inc.'s subsidiary TPI.  As stated above, CPC conditioned the TPI acquisition on CPC's hiring of Plaintiff Hart, TPI's President.   Hart was highly successful in the market for transportation personnel management services and had built a highly profitable company at TPI.

26.     Hart played an integral role in the acquisition, having steered Manpower, Inc. away from an offer for TPI by Transforce, Inc., and directing Manpower, Inc. to go with CPC if it desired to sell TPI.  Hart advocated for and materially assisted in assuring that CPC would be successful in the acquisition, which would generate millions of dollars in revenues and net profits for CPC.

27.     CPC conditioned the acquisition on its ability to bring Hart along with the deal.  CPC hired Hart and made him an officer of CPC as a Vice-President, initially charged with transitioning all of TPI's clients and managing them to start under CPC's newly-formed TP Logistics, Inc. ("TP Logistics"), a wholly-owned subsidiary of CPC.  Thereafter, Hart's role transitioned to sales and marketing.

28.     Hart was further responsible for bringing nearly eight hundred sourced employees/drivers to CPC through its TPI acquisition during the transition.  Even after the integration of TPI into CPC, this TPI business grew substantially. One client, for example, grew from 125 drivers to 400-500 drivers with CPC in subsequent years, and CPC still has multiple clients from the original TPI acquisition. Within several years, Hart became the sole salesperson for CPC. Hart substantially increased CPC's revenue streams, creating millions of dollars of profits from existing and new clients Hart brought to CPC.

29.     The TPI acquisition was the largest acquisition CPC had made in its forty-seven year history.  CPC paid under $1 million to acquire TPI.  When transformed by Hart into TP Logistics, the acquisition generated substantial, positive annual net income (nearly twice the acquisition cost annually) and tens of millions of dollars in annual revenue for many years.   Other CPC acquisition efforts in this segment, not involving Hart, have failed to produce positive results.

30.     When Hart joined CPC in 2004 the majority shareholders were Bickel Sr., D. LeGear, John Dowell, and Daniel Moroski ("Moroski").  Doug Crowell ("Crowell"), CPC's CFO, was a minority shareholder and board member and part of the due diligence team for the TPI acquisition and the first individual at CPC with whom Hart discussed a potential CPC-TPI deal. Over the years the group of majority, controlling shareholders and officers has evolved.

31.     To induce Hart to join CPC, its shareholders, directors, officers, and management made specific representations to Hart concerning equity ownership.  Specifically, Hart was told he was the only officer without stock but he would be next to receive stock as existing stockholders retired or transitioned stock for succession planning purposes.

32.     However, in 2006, two years after Hart joined CPC as an officer, Foltz was promoted to an officer position and became a shareholder.

33.     In 2007 multiple representatives of senior management of CPC, including Bickel Sr. and Crowell, repeated the commitment to provide shares to Hart and that he would be among several new owners as part of CPC's succession plan when the majority shareholders in management retire.  CPC also provided Hart a Severance Agreement, dated October 3, 2007 to protect Hart from their failure to provide an equity interest by this point in the event CPC was sold.

34.     By 2012, after majority shareholders Bickel, Sr., Dowell, and D. LeGear retired, the majority shareholders had changed to Crowell, then President and Chief Executive Officer, Wallis, Boyich, and Foltz, all of whom were shareholders, board members, and officers of CPC. By 2012, Bickel, Jr., A.H. LeGear, Trower and William Steimel ("Steimel") joined Hart as officers, but only Bickel, Jr. and A.H. LeGear (sons of Bickel, Sr. and D. LeGear) became shareholders at that time.

35.     In 2013 Hart received additional assurances that he would receive stock that would be equalized with Bickel Jr., and A.H. LeGear's holdings according to Boyich and Crowell. Boyich stated he "insisted on equal stock for each of you so no one feels more important than the others."  As more fully described below, these representations were not honored.

36.     Nevertheless, in 2017, when Crowell changed his position and tried to persuade the other majority shareholders to let him purchase Foltz shares, Wallis and Boyich intervened and insisted that prior commitments to the minority shareholders to equalize their holdings had to be met.

37.     In 2018 CPC's officers and executive management team consisted of:

| | |
|---|---|
| Douglas Crowell | President, Chief Executive Officer & Director |
| Robert Boyich | Executive Vice President–Western Operations, Secretary & Director |
| Harold Wallis, Jr. | Executive Vice President–Eastern Operations & Director |
| Larry Foltz | Executive Vice President–Midwestern Operations & Director |
| Duane Trower | Vice President-Finance & Chief Financial Officer |
| Jeff Hart | Vice President-Sales |
| John Bickel, Jr. | Vice President-Risk Management |
| Bill Steimel | Vice President-Information Technology |
| Hunter LeGear | Vice President & Corporate Counsel |

38.     In 2018 CPC's stock ownership was:

| | Shares | Percent |
|---|---|---|
| Doug Crowell | 4,025 | 20.1% |
| Robert Boyich | 4,025 | 20.1% |
| Butch Wallis | 4,025 | 20.1% |
| Larry Foltz | 4,025 | 20.1% |
| Hunter LeGear | 1,200 | 6.0% |
| John Bickel, Jr | 1,200 | 6.0% |
| Duane Trower | 500 | 2.5% |
| Jeff Hart | 500 | 2.5% |
| Bill Steimel | 500 | 2.5% |
| | 20,000 | 100.0% |

39.     CPC maintained a single class of common voting stock.  From time to time, CPC has obtained appraisals of non-marketable and non-control share values.  The historical values per share include:

**Prior Noncontrol Values**
$581 – 12/31/14
$612 – 11/01/12
$456 – 12/31/10
$488 – 12/31/09
$694 – 12/31/07
$631 – 12/31/05

An August 15, 2018 appraisal of CPC shares on a *control*, non-marketable basis as of December 31, 2017, appraised the share value at $23,468,000 or $1,173 per share, based on total shares rounded to 20,000.  "Control," for this appraisal, did not apply to any single shareholder but rather to a block of minority shareholders, none of whom had control individually.

40.     The original majority shareholders Bickel, Sr., D. LeGear, Dowell, Moroski and minority shareholder Crowell made or knew of the initial stock discussions with and specific commitments to Hart, including having him be in the next successor ownership group; and, eventual majority shareholders Crowell, Wallis, Boyich and Foltz all knew of the specific stock discussions and commitments to Hart.

41.     Crowell, Wallis, Boyich, and Foltz also represented to Hart they would "equalize" Hart's ownership with Bickel Sr. and D. LeGear's sons, John Bickel, Jr. and A. H. LeGear, respectively, along with Trower and, eventually, Steimel as the next ownership group (with equal shares each and as board members) as successors to Crowell, Wallis, Boyich, and Foltz as they retired.  The equalization of Hart's shares is referred to in contemporaneous documents.

42.     As noted above, CPC's majority shareholders, directors, officers, and management disregarded the specific representations to Hart regarding equity ownership. Instead, they promoted Foltz from a non-officer to officer (years after Hart joined as an officer) and from 2006 to 2011 gave Foltz a significant minority stock equity ownership stake until he became part of the majority shareholder group, without giving any stock to Hart as previously represented.

43.     CPC then promoted Bickel Sr.'s son, Bickel, Jr. and D. LeGear's son, A. H. LeGear, from non-officer positions to officer positions (again, years after Hart joined as an officer).  When Bickel Sr., D. LeGear, and Dowell retired (Moroski had also recently retired), Bickel Sr.'s and D. LeGear's sons, Bickel, Jr. and A. H. LeGear, respectively, were given 6% equity ownership each (largely "company-paid" with the remainder paid through favorable company loans), at which time Hart still had not been provided any equity ownership despite numerous prior representations, inducements and commitments for such ownership.

44.     As a consequence of his failure to timely obtain equity ownership despite a consistently positive work performance in which he transitioned virtually all TP Logistics clients and hundreds of drivers, grew revenue, and enhanced customer support, all of which ultimately made additional millions in profit for CPC from the TPI acquisition alone, Hart voiced his concerns to CPC's then President, Bickel, Sr. and Executive Vice-President, Moroski.

45.     Rather than provide the promised equity interest, CPC's Bickel Sr. then offered Hart an Employment/Severance Agreement, dated October 3, 2007, which provided Hart a two percent (2%) share of all proceeds from any sale of the company under certain conditions and a full year's salary if CPC terminated Hart or they separated for any reason other than "for cause" termination.   The Employment/Severance Agreement replaced Hart's prior employment agreement which provided over a half million dollars in severance if terminated without cause.

46.     Throughout Hart's tenure with CPC and as detailed below, CPC's officers and directors (including Crowell) and the Selling Shareholder Defendants made many more written and verbal promises to offer CPC stock to Hart and "equalization" of Hart's equity ownership with John Bickel, Jr. and A.H. LeGear and other officers and "tiers" of owners, including the minority ownership tier with Hart, Bickel Jr., A.H. LeGear, Trower, and Steimel.  These representations are evidenced by contemporaneous documents.

47.     These representations included that Hart's stock would be company-paid, largely through loans covered by grossed-up bonuses, as it had with previous equity owners and for Foltz, Wallis, Boyich, and Crowell, and substantial amounts of Bickel, Jr. and A.H. LeGear stock paid for by special company bonuses, profit distributions, or similar financial payments. The representations also included that minority shareholders, specifically Hart, would join the board of directors upon retirement of the majority owners.

48.     The denial of CPC's commitments to Hart came to a head during and following a meeting of the Board of Directors on March 13, 2019.  At a lunch Hart had with Bickel Jr. and A.H. LeGear prior to Hart's discussion of sales with the directors, Bickel Jr. and A.H. LeGear indicated that Foltz, Boyich, and Wallis wanted to get together with the minority shareholders to develop a strategy to remove Crowell from CPC.

49.     Then, during the March 13 directors' meeting Hart presented a strategy for future sales efforts, and was asked what he meant by the reference on page 17 of his report about CPC's commitments to him.  Hart explained, again, the commitments made on provision of stock, and that if he had known that after 12-15 years of hard work he would only have his small minority stake, contrary to the express commitments noted above, he would have never brought TPI to CPC. Crowell denied he made the commitments or had authority to make the commitments despite his actual and apparent authority to do so.  Within several weeks of this meeting Crowell was given the opportunity to resign and was gone with a substantial severance package.

50.     CPC's bylaws contain restrictions on the transfer of CPC shareholders' stock. Among other conditions and restrictions, upon notice by a shareholder who desires to sell shares, any non-selling shareholder has an option for sixty (60) days to purchase stock offered *in the percentage of their respective stock ownership* in CPC.  If there are any remaining shares, CPC has a thirty (30) day option to buy them.  If CPC declines, the selling shareholder may sell to a third-party at a price not less than the original notice of sale.   Any sale of shares requires a bona fide offer and notice.

51.     Under CPC's bylaws the company has the right to purchase the shares of any shareholder who reaches 70 years of age at an appraised value.

52.     Under CPC's bylaws directors' compensation is limited to a fixed sum and expenses for attendance at meetings.  Art. III, §6.

53.     CPC shareholders are also subject to the Stockholders' Agreement dated December 31, 2001.  The Stockholder Agreement prohibits any shareholder from offering, selling or transferring any or all the shareholder's shares except in compliance with its terms, which mirror the above restrictions in CPC's bylaws.  Any sale of shares requires a bona fide offer and notice.

54.     In 2018, the Selling Shareholder Defendants and CPC's former President, Crowell, engaged an investment banker and began the process of trying to sell CPC without the knowledge of the minority shareholders, including the Buying Shareholder Defendants and Hart.  All minority shareholders objected and Hart's disclosure of his Employment/Severance Agreement, among other considerations, caused termination of the Selling Shareholder Defendant's proposal.

55.     On or about August 3, 2018, the minority shareholders, including Hart, made a counterproposal to buy out the Selling Shareholder Defendants, which they rejected.

56.     In order for Hart to add to his mere 2.5% equity interest he received in 2015 (8 years after he was told he would receive it and after 3 newer officers received more stock, largely company-paid, before him) and at the same time Trower and Steimel received their initial 2.5%, the Defendants required Hart to enter into a Revised Shareholders Agreement, dated December 11, 2019 ("Shareholder Agreement").   The Shareholder Agreement, among other things, prohibits the shareholders from offering their shares for sale without compliance with its terms and offers all non-selling shareholders a purchase option.

57.     Moreover, Defendants required Hart, under economic duress, to give up his Employment Agreement/Severance Agreement, including the right to obtain an additional 2% upon the sale of the company.  Hart was explicitly told, despite his protests that this agreement was negotiated in good faith with the company, that he must agree to terminate this agreement in exchange for him to obtain the low-interest company loan to buy his portion of shares from Crowell's retirement and sale of stock. When Hart protested he asked Wallis to discuss this decision with an attorney; Wallis replied he "didn't have to."

58.     Instead, Wallis repeated the representation that he would equalize the "tier 2" (minority) shareholders upon the anticipated retirement of Foltz.   He would make this

recommendation to the Board and each of the minority shareholders would have to agree to an adjustment in the percentage of Foltz' stock they would acquire in order to comply with the Shareholder Agreement.   This equalization proved illusory as Wallis failed to make the proposal but instead conspired with the other Selling Shareholder Defendants to eliminate Hart's Employment/Severance Agreement (an inconvenient barrier) and to sell the Selling Shareholder Defendants' shares to the Buying Shareholder Defendants.

59.     No other minority owner/buyers of Crowell's stock (Bickel, Jr., A.H. LeGear, Trower, or Steimel) had an Employment/Severance Agreement with CPC to give up and each received company loans to buy their stock at this time.  On December 10, 2019, CPC required Hart to sign an Acknowledgement and Agreement to Cancel and Terminate Severance Agreement.  In effect, CPC forced Hart to surrender his Employment/Severance Agreement in exchange for the "equalization representation" and to obtain company loans to buy Crowell's stock and the second stage of Foltz' stock.  Absent elimination of the Employment/Severance Agreement, it is doubtful acceptable terms could be offered to the other minority shareholders either.

60.     Unbeknownst to Hart, and after months of work by the Buying Shareholder Defendants on a deal with the Selling Shareholder Defendants, in late 2019 into early 2020 three of the Buying Shareholder Defendants and CPC's Controller, offered a buy-out of the Selling Shareholder Defendants at a premium price to be paid with loans arranged through CPC's bank, CIBC or its subsidiary, CIBC Private Wealth Management, which they arranged for themselves individually and as a group.  The Buying Shareholder Defendants made their offer to purchase shares in a letter to Wallis, Boyich, and Foltz dated January 22, 2020.

61.     The proposal was approximately twice what CPC paid Crowell, the prior president/CEO, for his shares per the terms of the bylaws and  Shareholder Agreement only months

14

before when he retired and far higher than any prior appraised value of the stock .   On information and belief, none of the Defendants secured an appraisal or fairness opinion to support the share price offered.

62.     The Defendants did not disclose these discussions, the offer to sell and to buy negotiated among them, and the financing arrangements they had worked out with CIBC or its affiliate.  Only after the sale was a *fait accompli*, Defendants disclosed to Hart the offer and the timeline for him to try to meet the exorbitant price Defendants arranged. This high share price made it crucial for Hart to obtain a loan from the company, per previous practice, or with CIBC under the favorable terms the Buying Shareholder Defendants received by virtue of the banking relationship between CPC and CIBC.

63.     On February 17, 2020 The Buying Shareholders made a formal Non-Binding Offer to Purchase Shares in CPC Logistics, Inc.   The offer recited the terms and conditions on which the Buying Shareholder Defendants would acquire all of the shares of Wallis, Boyich, and Foltz, the Selling Shareholder Defendants.  Notably, had the Buying Shareholder Defendants waited a short time until Foltz reached 70, CPC could have compelled sale of his shares under the Shareholder Agreement valuation and price terms, for an amount approaching one-half of what the Buying Shareholder Defendants propose to pay.

64.     On or about Feb. 27th, 2020, A. H. LeGear, Bickel, Jr. and Trower finally told Hart that they, together with CPC's controller, had for months been secretly working on and, ultimately, completing negotiations for a deal with majority owners to buy out the majority owners, the Selling Shareholder Defendants.  Trower confirmed the Buying Shareholder Defendants had worked out "a sweetheart deal" through CIBC or one of its subsidiaries, CPC's bank, to secure the loans on favorable terms necessary to facilitate this deal.

65.     Hart asked Trower, Bickel, Jr. and A.H. LeGear for the names of the CIBC bankers they worked with so he could secure a loan for the same terms they had arranged. They categorically refused to provide any contact information, saying CIBC will not give Hart such a loan to buy more shares because of a purported "conflict of interest." Both the Buying Shareholder Defendants and Hart are shareholders and officers of CPC, a closely held corporation, and there is no conflict of interest in all of them accessing the relationship with CIBC, CPC's bank, to secure financing, even on an individual basis.

66.     The Defendants further represented that Hart's acquisition of more shares would dilute the Buying Shareholder Defendants' stock ownership stake and that CIBC would not make such loan to Hart because going forward Hart will not be part of the controlling ownership group and Board of Directors like Trower, Bickel, Jr. and A.H. LeGear will be. Neither the Selling Shareholder Defendants nor Buying Shareholder Defendants have any authority to unilaterally impose such conditions and breach the representations Defendants and their predecessors, as agents of CPC, made to Hart.

67.     The failure to disclose the discussions had the effect of excluding Hart from development of the terms, delaying the time to respond to a short window to which the Buying Shareholder Defendants were not subject, and allowing formation of a new control group without Hart's involvement, despite the specific representations he would be part of the control group and his contributions to the success of CPC.

68.     The Defendants' respective decisions to buy and sell CPC shares at an exorbitant price qualifies as a breach of the Shareholder Agreement's *bona fide offer or transaction* requirement. The Selling Shareholder Defendants stand to profit from an unreasonably high offer price untethered to any recent valuation, appraisal, or transaction reflecting any legitimate measure

of the shares' value.  Seeking and accepting an exorbitantly high price constitutes self-dealing and violates fundamental fiduciary duties of directors and controlling shareholders, including duties owed to CPC and the minority shareholders.

69.     The Buying Shareholder Defendants stand to profit from the unreasonably high offer as it serves as an effective barrier to block share purchases by any other minority shareholder, including Hart. Further, with the barrier established, once other minority shareholders are constrained, the Buying Shareholder Defendants can limit their financial exposure by using the past practices of having the company fund stock purchases or limit their purchases by further agreement with the Selling Shareholder Defendants.  Imposing this artificial and exorbitantly high price as a strategy to block other minority shareholders to enhance their control is not a bona fide offer and further constitutes self-dealing and violates fundamental fiduciary duties of directors and controlling shareholders, including duties owed to CPC and the minority shareholders.

70.     Hart is damaged by these breaches because they deprive Hart of critical information and sufficient time to review and secure additional resources as needed.  If allowed to proceed further, Defendants' actions will substantially dilute Hart's percentage share and equity interest in the company, with control of the company given to a favored group, all to his substantial detriment.

71.     Defendants engaged in the conduct alleged in this Complaint, to exclude Hart from his rightful position as a shareholder, and in violation of their fiduciary duties to Hart and in breach of the CPC's bylaws, and the Shareholder Agreement.  This course of conduct has been continuous since at least 2007 and continues to this day; the contractual and other legal violations alleged were repeated over and over and reflected in writings in 2015, 2017 and at other times within the last five years.

72.     Defendants' conduct is particularly egregious and in bad faith given the financial performance of CPC since 2004 and particularly the improving financial results and increasing share values between 2017 and 2019.

73.     The Selling Shareholder Defendants and the Buying Shareholder Defendants have conducted the business to the exclusion of the contractual rights and reasonable expectations of Hart as a shareholder.  Defendants have managed and continue to threaten to manage CPC for their own personal benefit rather than in the interests of all shareholders.

74.     The Defendants who are directors of CPC have taken actions to harm CPC by paying themselves excessive distributions, directors' fees, and allowances and expenses, and by causing CBC to breach material contractual commitments to key employees, including Hart, and to make fraudulent misrepresentations to them.  These actions are or will be harmful to CPC and its reputation.

75.     Hart has protested Defendants handling of contractual and stock management actions to no avail.  Given the circumstances, any further demand would be futile.

76.     Defendants have engaged in self-dealing and their acts and omissions reflect adversely on the integrity of management and the reputation of CPC.

77.     The Selling Shareholder Defendants, once D. LeGear, Bickel, Sr., and Dowell left CPC, substantially deviated from past practices and awarded themselves materially increased compensation, benefits, allowances and directors' fees in excessive amounts which harmed the corporation, violated its bylaws, negatively impacted its growth, and harmed the minority shareholders.  These self-enriching actions breached their fiduciary duties to CPC, Hart, and other minority shareholders by diluting resources for client support, acquisition of competitors, company

stock buyback/reimbursement of loans for stock, and any unforeseen risk contingencies, among other more appropriate uses of CPC's assets.

78.     After Hart requested his concerns over the stock be addressed in March 2020, Defendants placed Hart on paid administrative leave, threatened to terminate his employment if Hart filed this action, and terminated his wife's part-time employment with CPC.

79.     Further, although CPC has customarily paid off such loans, CPC now threatens to call demand notes to Hart for purchase of his prior stock.

80.     Defendants' actions were performed intentionally and recklessly in complete disregard of the rights of other shareholders, including Hart, and were undertaken with malice.

81.     The option provided to Hart to purchase shares under the Shareholder Agreement, while futile due to Defendants' conduct, expires on April 27, 2020.   The shares represent property and investment interests that are unique in character and for which there is no efficient market for purchases and sales of the stock.  Defendants' actions threaten immediate and irreparable injury to Hart, for which there is no adequate remedy at law, absent intervention of the Court.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**

82.     Plaintiff incorporates by reference paragraphs 1-81 above.

83.     The Selling Shareholder Defendants were members of the board of directors, officers, and shareholders of CPC with control and responsibility for CPC's business affairs, which they exercised for their own personal benefit.

84.     The Buying Shareholder Defendants were shareholders of CPC.  The Buying Shareholder Defendants, as officers and management employees of CPC, exercised or sought to exercise control and responsibility for CPC's business affairs for their personal benefit.

85.     Defendants owed CPC and/or their fellow shareholders fiduciary duties, including:

19

a) the duty to fully disclose all important financial transactions;

b) the duty to be loyal;

c) the duty not to engage in self-dealing;

d) the duty to avoid waste of the Plaintiffs' capital and funds;

e) The duty to protect CPC's interests and the interests of all of its shareholders;

f) the duty to manage CPC at all times for the sole benefit of the shareholders;

g) the duty to deal honestly, forthrightly, and in good faith with Hart; and

h) the duty act with the utmost vigilance, good faith and diligence in handling the assets and financial transactions of CPC.

86.    Defendants breached these duties by, among other things:

a) Breaching specific promises to provide Hart with stock in the timeframe promised, including at the end of his initial three years of employment and when the then-current majority owners (Bickel, Sr., Moroski, D. LeGear) retired;

b) Breaching promises to equalize Hart's equity position with other minority shareholders on a timely basis;

c) Inducing Hart to remain in CPC's employ while he had no restrictions with material representations as to securing an equity position and board seat;

d) Pressuring and forcing Hart to give up his rights under the Employment/Severance Agreement;

e) Intentionally violating the Shareholder Agreement;

f) Arranging for the offer and sale of the Selling Shareholder Defendants' shares without prior disclosure or discussion of terms;

g) Arranging for the offer and sale of the Selling Shareholder Defendants' shares to secure controlling interests in a control group, the Buying Shareholder Defendants;

h) Paying exorbitant directors' fees approaching or above $100,000 annually and other financial benefits to the detriment of minority shareholders, including Hart.

87. Defendants' breaches of their fiduciary duties proximately caused or threaten to cause more than $10,000,000.00 in damages to Plaintiff.

88. Defendants' multiple breaches of fiduciary duties and self-serving conduct warrants punitive damages. Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, providing evidence that their conduct demonstrated a reckless disregard for the rights of others.

## COUNT II
## DECLARATORY JUDGMENT ACTION, 28 U.S.C. §2201 *et seq.*

89. Plaintiff incorporates by reference paragraphs 1-88 above.

90. There is a real, substantial and presently-existing controversy between the parties concerning whether Defendants have breached CPC's bylaws and the Shareholder Agreement.

91. Plaintiff maintains that the Selling Shareholder Defendants have violated the express terms of the Shareholder Agreement by offering to sell or transfer all or any part of the shares of CPC they own in an undisclosed transaction to a select group of minority shareholders who can access company bank resources for financing to pay an exorbitant amount.

92. Plaintiff maintains that the Buying Shareholder Defendants have violated the express terms of the Shareholder Agreement by offering to buy all or any part of the shares of CPC the Selling Shareholder Defendants own in an undisclosed transaction to benefit a select group of minority shareholders who can access company financing bank resources to pay an exorbitant amount.

93.     Plaintiff further maintains that the Buying Shareholder Defendants have not made a bona fide offer to purchase the Selling Shareholders' stock or provided adequate notice of their intent to do so as required by the Shareholder Agreement and Bylaws.

94.     Plaintiff further alleges the Selling Shareholder Defendants are each minority shareholders themselves, but only by entering into agreements among themselves are they aboe to exercise "majority" control.  Absent such wrongful agreements, the value of their shares woiuld be subject to minority and lack of control discounts.  The Selling Shareholder Defendants know the share price is excessive and not a bona fide offer and that they can obtain such price only with a wrongful agreement with the Buying Shareholder Defendants.

95.     Defendants deny they have violated the Shareholder Agreement.

96.     This controversy is a justiciable controversy, subject to immediate or prospective consequential relief.

97.     Plaintiff Hart has a legally protectable interest at stake in this controversy.  Based on Defendants' proposed transactions Hart stands to have his percentage of shares and equity interest in CPC substantially diluted and see control given over to a favored group to his detriment.

98.     The Shareholder Agreement also contains a covenant not to compete.  At the same time the Buying Shareholder Defendants seek to gain control over CPC they are also in a position to attempt to restrain Hart from seeking alternative employment in the business he has built or related businesses.

99.     There is also a justiciable controversy as to the enforceability of the covenant not to compete given Defendants' prior breaches of the Shareholder Agreement, breaches of fiduciary duties, fraudulent inducement, and violations of the covenant of good faith and fair dealing.

100.    Plaintiff has no adequate remedy at law.

## COUNT III
## SHAREHOLDER OPPRESSION
## MO. REV. STAT. §351.850

101.    Plaintiff incorporates by reference paragraphs 1-100 above.

102.    The Defendants are in control of CPC and have acted in a manner that is illegal, oppressive, fraudulent, in bad faith, and outside the standards of fair dealing on which every shareholder is entitled to rely.

103.    Defendants' actions, as alleged in this Complaint, demonstrate use of their control to obtain increased ownership of CPC and profits for themselves at the expense of Hart, and were undertaken to disadvantage the minority shareholders, including Hart.

104.    The Selling Shareholder Defendants have acted for their personal benefit and engaged in oppressive acts by agreeing to accept exorbitantly high, premium-level payments for their stock in a transaction designed to exclude Hart from his rightful position as a shareholder in violation of fiduciary duties and contractual obligations, all for the benefit selected shareholders, in violation of CPC's bylaws and the Shareholder Agreement.

105.    The Buying Shareholder Defendants have acted for their personal benefit and engaged in oppressive acts by agreeing to pay exorbitantly high, premium-level payments for the Majority Shareholder Defendant's stock in order to dilute Hart's shares and to obtain and secure control of CPC for themselves.

106.    The Defendants have engaged in further oppressive acts, including threatened termination of employment for pursuing relief for his claims and terminating his wife's employment.

107.    The Defendants' actions have proximately caused significant actual damage to Hart, and he is entitled to full damages, interest, and attorneys' fees as provided by Missouri law.

## COUNT IV
## PROMISSORY ESTOPPEL

108.    Plaintiff incorporates by reference paragraphs 1-107 above.

109.    Defendants made the following material promises to Hart:

    a.  Hart will receive CPC stock in a few years (2007);

    b.  Hart will receive CPC stock when the then-current majority shareholders (Bickel Sr., Moroski, Dowell, D. LeGear) retire;

    c.  Hart will be the next officer to receive stock as he is the only officer without it;

    d.  Hart will receive stock with the next tier of owners with Bickel, Jr., A.H. LeGear, and Trower, and later the same group as a tier with Steimel added;

    e.  Hart's CPC stock will be financed/paid for as it was with prior owners;

    f.  After CPC granted stock to Bickel, Jr. and A.H. LeGear, Hart will be next to receive stock with Trower and Steimel, with Hart shares "equalized" with Bickel, Jr. and A.H. LeGear's shares;

    g.  When CPC caused release of Hart's Employment/Severance Agreement under duress, Defendants once again promised Hart equalization of shares with Bickel, Jr. and A. H. LeGear;

    h.  Hart will receive the same benefits as all other shareholders when he becomes a shareholder, including long-term care insurance benefits; and

    i.  Hart will join the CPC board of directors when the majority shareholder directors retire.

110.    Hart had a right to rely on Defendants' promises and changed his position in reasonable reliance on them.

111.     Hart did not maintain or take advantage of alternative lucrative employment opportunities with long term equity investment benefits and terms in reliance on Defendants' promises.

112.     Defendants breached the promises, without cause or justification.

113.     As a direct and proximate result of Defendants breach of their promises, Plaintiff Hart suffered actual damages.

## COUNT V
## FRAUD/MISREPRESENTATION

114.     Plaintiff incorporates by reference paragraphs 1-113 above.

115.     Defendants' representations were false statements of present, material facts.

116.     Defendants knew that their representations were false when made.

117.     Defendants intended to deceive and induce Hart to remain with CPC and perform at a high level to earn them profits while never intending to perform their representations.

118.     Hart had a right to rely on Defendants' representations and changed his position in reasonable reliance on them.

119.     Hart did not take alternative lucrative employment opportunities with long term equity investment benefits and terms in reliance on Defendants' promises.

120.     As a direct and proximate result of Defendants fraudulent misrepresentations, Plaintiff Hart suffered actual damages.

121.     Defendants concealed the falsity of their continuing misrepresentations and Plaintiff was not guilty of a lack of diligence in ascertaining Defendants' misconduct.

122.     Defendants' conduct is of a continuous nature, and includes actions up to and including the Buying Shareholder Defendants' offer for the Selling Shareholder Defendants' shares.

123.    As a direct result of the continuing nature of Defendants' false representations and fraudulent concealment, Plaintiff was prevented from making a claim prior to this complaint.

124.    Defendants' conduct warrants punitive damages.  Their conduct was malicious, willful, wanton, intentional, and outrageous, providing clear evidence that their conduct demonstrated a reckless disregard for the rights of others.

## COUNT VI
## FRAUDULENT INDUCEMENT

125.    Plaintiff incorporates by reference paragraphs 1-124 above.

126.    Defendants' representations were false statements of present, material facts.

127.    Defendants knew that their representations were false and likely to induce Hart to facilitate the sale of TPI to CPC and leave his prior employment, and thereafter to maintain his employment with CPC.

128.    Defendants intended to deceive and induce Hart to remain with CPC and perform at a high level to earn them profits while never intending to perform their representations.

129.    Hart had a right to rely on Defendants' false representations and changed his position in reasonable reliance on them.

130.    Hart did not take alternative lucrative employment opportunities with long term equity investment benefits and terms in reliance on Defendants' promises.

131.    As a direct and proximate result of Defendants fraudulent misrepresentations and inducements, Plaintiff Hart suffered actual damages.

132.    Defendants concealed the falsity of their continuing misrepresentations and Plaintiffs were not guilty of a lack of diligence in ascertaining Defendant's misconduct.

26

133.    Defendants conduct is of a continuous nature, and includes actions up to and including the Buying Shareholder Defendants' offer for the Selling Shareholder Defendants' shares.

134.    As a direct result of the continuing nature of Defendants' claims and fraudulent concealment, Plaintiff was prevented from making a claim prior to this complaint.

135.    Defendants' conduct warrants punitive damages.  Their conduct was malicious, willful, wanton, intentional, and outrageous, providing clear evidence that their conduct demonstrated a reckless disregard for the rights of others.

**COUNT VII**
**BREACH OF CONTRACT**
**EMPLOYMENT/SEVERANCE AGREEMENT**

136.    Plaintiff incorporates by reference paragraphs 1-135 above.

137.    CPC formed an express contract to employ Hart on the terms of the Employment/Severance Agreement.

138.    Defendants purported to secure Hart's relinquishment of the Employment/Severance Agreement on false pretenses and without consideration.  The purported termination of the Employment/Severance Agreement is therefore void.  The offer of loans by CPC for purchase of shares is not valid consideration, as no such condition as relinquishment of a severance agreement was required of any other shareholder buying shares at the time.

139.    Access to the loans from CPC for purchase of shares was necessary for Hart to protect his rights given the time frame required for action, and Defendants knew the extreme pressure conditioning access to loans on surrender of his agreement would impose on Hart.

140.    Hart provided valuable consideration for the Employment/Severance Agreement.

141.    Hart has performed all of his obligations under the Employment Severance/ Agreement and satisfied all conditions precedent for enforcement of it.

142.    Hart is entitled to specific performance of the Employment/Severance Agreement.

143.    CPC's breach has proximately caused Hart significant damages.

## COUNT VIII
## BREACH OF CONTRACT
## SHAREHOLDER AGREEMENT

144.    Plaintiff incorporates by reference paragraphs 1-143 above.

145.    The shareholders of CPC formed and entered into the Shareholder Agreement, an express contract to control and govern the terms and conditions of the ownership of their CPC stock, including specific obligations concerning any offer for sale of CPC shares.

146.    The Shareholder Agreement is supported by valuable consideration among the shareholders.

147.    Article I § A (1) requires notice and a bona fide offer to trigger any sale of shares by a shareholder.

148.    As previously alleged, Defendants failed to present adequate notice or a bona fide offer for a bona fide transaction.

149.    Hart has performed all of his obligations under the Shareholder Agreement and satisfied all conditions precedent for enforcement of it.

150.    The Selling Shareholder Defendants and the Buying Shareholder Defendants have materially breached the Shareholder Agreement.

151.    Given the secret discussions and agreements between the Selling Shareholder Defendants and the Buying Shareholder Defendants, Defendants were and are in a position to control administration of the Shareholder Agreement and they have not administered the

agreement in good faith but rather manipulated the purchase price to exclude participation by other shareholders, including Hart.

152.    Hart is entitled to specific performance of the Shareholder Agreement or, alternatively, to be free from all of its terms.

153.    Defendants' breach has proximately caused Hart significant damages.

**COUNT IX**
**BREACH OF CONTRACT**
**BYLAWS**

154.    Plaintiff incorporates by reference paragraphs 1-153 above.

155.    The bylaws of CPC form an express contract among the shareholders, officers, and directors of CPC.

156.    The bylaws establish formal mechanisms to control and govern the terms and conditions of the ownership of CPC stock, including specific obligations concerning any offer for sale of CPC shares.

157.    Defendants failed to provide adequate notice or communicate a bona fide offer for purchase of the Selling Shareholder Defendants' shares.

158.    The bylaws are supported by valuable consideration among the shareholders.

159.    Hart has performed all of his obligations under the bylaws and satisfied all conditions precedent for enforcement of them.

160.    The Selling Shareholder Defendants and the Buying Shareholder Defendants have materially breached the bylaws by arranging the sale of shares in violation of the letter and spirit of the bylaws.

161.    Given the secret discussions and agreements between the Selling Shareholder Defendants and the Buying Shareholder Defendants, Defendants were and are in a position to

control administration of the Bylaws and not administered the Bylaws in good faith but rather manipulated the purchase price to harm other shareholders, including Hart.

162.    Hart is entitled to specific performance of the Bylaws or, alternatively to be free from all of its terms.

163.    Defendants' breach has proximately caused Hart significant damages

**COUNT X**
**BREACH OF IMPLIED CONTRACT**

164.    Plaintiff incorporates by reference paragraphs 1-163 above.

165.    Defendants entered into an implied contract or contracts to perform:

   a.   Delivery of CPC stock to Hart when the initial three years of employment ended;

   b.   Delivery of CPC stock to Hart when majority shareholders Bickel Sr., Moroski, Dowell, and D. LeGear retired;

   c.   Delivery of CPC stock to Hart as the only officer without it;

   d.   Delivery of CPC stock to Hart  with the next tier of owners with Bickel, Jr., A.H. LeGear, and Trower and later the same group as a tier with Steimel added;

   e.   Arrangements for financing Hart CPC stock as was provided to prior owners;

   f.   After CPC granted stock to Bickel, Jr. and A.H. LeGear, delivery of CPC stock to Hart together with Trower and Steimel, with Hart's shares "equalized" with Bickel, Jr. and A.H. LeGear's shares;

   g.   Equalization of Hart's share holdings with Bickel, Jr. and A. H. LeGear  when CPC caused release of Employment/Severance Agreement;

   h.   Provision to Hart of the same benefits as all other shareholders when he becomes a shareholder, including long-term care insurance benefits; and

   i.   Provision of a board seat to Hart as soon as majority shareholder directors' retire.

166.    Hart gave valuable consideration for these enforceable agreements.

167.    Hart did not take alternative lucrative employment opportunities with long term equity investment benefits and terms in reliance on the implied contract with Defendants.

168.    Defendants breached the implied agreement, without cause or justification.

169.    As a direct and proximate result of Defendants breach of the implied agreement, Plaintiff Hart suffered actual damages.

170.    Hart has performed all of his obligations under the implied agreement and satisfied all conditions precedent for enforcement of it.

171.    CPC and Defendants' breach has proximately caused Hart significant damages.

## COUNT XI
## CIVIL CONSPIRACY

172.    Plaintiff incorporates by reference paragraphs 1-171 above.

173.    The Buying Shareholder Defendants specifically intend to become the majority controlling shareholders of CPC by breaching fiduciary duties, engaging in fraud, and breaching contractual obligations to Hart.

174.    The Buying Shareholder Defendants have solicited and obtained the agreement of the Selling Shareholder Defendants to aid them in securing control of CPC.

175.    There is a meeting of the minds reflected in the secret discussions and negotiations leading to the Selling Shareholder Defendants offer and the Buying Shareholders pursuit of acquisition of their shares at an exorbitant premium price with discriminatory access to CBC banking relationships to the exclusion of Hart.

176.    The refusal to provide information to a fellow shareholder regarding the CIBC bank contact is one overt act.  The secretive development of the share proposal, in violation of express and implied contractual commitments to Hart, as well as fiduciary duties, constitute additional

overt acts.  On information and belief, the communications underlying the secretive development of the share proposal involved use of the wires and U.S. Mail, in violation of the Wire Fraud and Mail Fraud statutes, 18 U.S.C. §§ 1343 & 1341, respectively.

177.    Defendants have no legal cause or justification for the object of their agreement, overt actions to effectuate their agreements, and civil conspiracy to perform wrongful acts.

178.    As a direct and proximate result of Defendants agreement and civil conspiracy, Plaintiff Hart suffered actual damages.

179.    Defendants' wrongful conspiracy to perform tortious acts warrants punitive damages.  Their conduct was malicious, willful, wanton, intentional, and outrageous, providing clear evidence that their conduct demonstrated a reckless disregard for the rights of others.

## COUNT XII
## COVENANT OF GOOD FAITH & FAIR DEALING

180.    Plaintiff incorporates by reference paragraphs 1-179 above.

181.    Defendants were in a position to provide the contractually agreed and promised stock and board seat to Hart.  Defendants controlled the denial of stock and the board seat.

182.    Due to their positions the Buying Shareholders and Selling Shareholders were in a position to deny the reasonably expected benefits to Hart of performance of the contracts and promises alleged above.

183.    Defendants exercised their unilateral control and discretion with regard to the provision of stock and board seat to Hart in bad faith and for self-serving motivations, completely devoid of any form of good faith and fair dealing.

184.    Defendants have no legal cause or justification for the object of their agreement, overt actions to effectuate their agreements, and civil conspiracy to perform wrongful acts.

185.    As a direct and proximate result of Defendants agreement and civil conspiracy, Plaintiff Hart suffered actual damages.

186.    Defendants' conduct warrants punitive damages.  Their conduct was malicious, willful, wanton, intentional, and outrageous, providing clear evidence that their conduct demonstrated a reckless disregard for the rights of others.

**COUNT XIII**
**INJUNCTIVE RELIEF**

187.    Plaintiff incorporates by reference paragraphs 1-186 above.

188.    In addition to monetary damages, Plaintiff will suffer immediate and irreparable harm to his business interests and lose unique stock and the right to participate in the future management and control of CPC if Defendants are allowed to continue to pursue and close on the purchase and sale of the Selling Shareholder Defendants' stock by the Buying Shareholder Defendants.

189.    Plaintiffs will suffer immediate and irreparable harm due to the deadline for the purchase and sale of the stock at issue and its unique character, particularly with the nascent change in the composition of the control group.

190.    Injunctive relief is necessary to prevent Defendants from continuing to harm and interfere with Plaintiff Hart's contractual rights and rights as a shareholder.  Plaintiffs have no adequate remedy at law.  The irreparable harm to the Plaintiff from Defendants' continuing misconduct cannot be easily quantified or calculated.

191.    Any harm to Defendants is far outweighed by the harm to Plaintiff and the equities.

192.    The public interest would be served by entry of an injunction to sustain the integrity of corporate governance, affirm the sanctity of contract, and avoid substantial inequity.

193.    Plaintiff is likely to succeed on the merits of his claims and causes of action.

## JURY DEMAND

Plaintiff demand a trial by jury on all counts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter a judgment in his favor and against Defendants:

    a.  Entering a temporary restraining order and thereafter a preliminary and permanent injunction prohibiting Defendants from violating the bylaws and Shareholder Agreement;

    b.  Entering a temporary restraining order and mandatory permanent injunction requiring Defendants to  provide the number of shares to Plaintiff to equalize his shareholdings with the existing shareholders in the Shareholder Buying Defendants group;

    c.  Alternatively, entering a mandatory injunction requiring Defendants to purchase Plaintiff's shares on the same terms as offered to the Selling Shareholders and pay Plaintiff the severance required under the Employment/Severance Agreement;

    d.  Entering a temporary restraining order, preliminary and permanent injunction enjoining Defendants from violating Shareholder Agreement and  from closing on the sale of the Selling Shareholders Defendants' stock to the Buying Shareholder Defendants;

    e.  Entering declaratory judgment that Defendants have anticipatorily breached, violated and repudiated the Shareholder Agreement and Bylaws;

    f.  Entering declaratory judgment that Plaintiff Hart is relieved of any obligation to comply with any terms of the Shareholder Agreement and Bylaws;

g.  Awarding Plaintiff actual damages in an amount to be proven at trial but believed to exceed $10 million, and prejudgment and post-judgment interest, reasonable costs, and attorneys' fees;

h.  Awarding Plaintiff punitive damages; and

i.  Providing such further and other relief as this Court deems just and proper.

Dated: April 17, 2020

Respectfully submitted,

**HEPLERBROOM LLC**

By: /s/ Glenn E. Davis
      Glenn E. Davis #30308
      Charles N. Insler #58623
      One Metropolitan Square
      211 N. Broadway, Suite 2700
      St. Louis, MO 63102-2740
      T: 314.241.6160
      F: 314.241.6116
      glenn.davis@heplerbroom.com
      charles.insler@heplerbroom.com
      ***Attorneys for Plaintiff***

## **VERIFICATION**

Duly sworn verification electronically filed contemporaneously with this Complaint.