UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEFFREY W. HART,                              )
                                             )
                                             )
                Plaintiff,                    )
                                             )
        v.                                    )        Case No. 4:20-cv-00552-AGF
                                             )
HAROLD B. WALLIS, JR., President &           )
CEO; ROBERT J. BOYICH, Secretary;            )
LARRY M. FOLTZ; JOHN T. BICKEL,              )
JR.; A. HUNTER LEGEAR; DUANE G.              )
TROWER; and CPC LOGISTICS, INC.              )
                                             )
                Defendants.                   )

## **MEMORANDUM AND ORDER DENYING A**
## **TEMPORARY RESTRAINING ORDER**

This matter is before the Court on the motion (ECF No. 5) of Plaintiff Jeffrey W.

Hart for a temporary restraining order ("TRO") against the company in which he is a

minority shareholder, Defendant CPC Logistics, Inc. ("CPC"), and his fellow

shareholders:  Defendants Harold B. Wallis, who is also President, CEO and a director of

CPC; Robert J. Boyich ("Boyich"), who is also Secretary and a director of CPC; Larry M.

Foltz ("Foltz"), a director of CPC; John T. Bickel, Jr. ("Bickel, Jr."); A. Hunter LeGear

("A.H. LeGear"); and Duane G. Trower ("Trower").  Hart seeks to enjoin the sale of

directors and shareholders Wallis, Boyich, and Foltz's (collectively, the "Selling

Shareholders") shares, which together represent a controlling stake in CPC, to minority

shareholders Bickel, Jr.,  LeGear, and Trower (the "Buying Shareholders").

Defendants received notice of the motion, entered their appearances, and filed responses.  The Court heard oral argument on the motion on May 11, 2020.  For the reasons explained to the parties at the hearing, and upon review of the entire record, Hart's motion will be denied.

## BACKGROUND

CPC, which is incorporated under Missouri law, provides drivers, logistics personnel, and related services to transportation companies.  CPC has only one class of voting stock.  It is currently held by eight shareholders.

### Hart's 2004 Employment Agreement With CPC

In April 2004, CPC hired Hart as a Vice President in conjunction with acquiring the company Transpersonnel, Inc. ("TPI"), of which Hart was then president.  The asset purchase agreement dated April 2, 2004, by which CPC acquired TPI contemplated negotiation of a three-year employment agreement between CPC and Hart; and on April 6, 2004, CPC and Hart entered into a three-year Employment Agreement.  The Employment Agreement, attached as an exhibit to Defendants' briefs (ECF No. 24-2) set forth Hart's compensation, including an annual salary of $185,000, and other terms of employment, and contained the following merger clause:

> This Agreement contains the entire agreement between the parties regarding HART'S employment by CPC and this Agreement together with the aforesaid Asset Purchase Agreement contain the entire agreement between the parties regarding HART'S assistance in the transition of former clients, customers and accounts of [TPI] to CPC and regarding HART'S continuing employment by and duties to CPC and this agreement may not be amended, altered or modified except in a writing signed by both parties. The parties agree that in entering into this Agreement, they have not in any way relied,

2

and will not rely, on any representation not specifically set forth herein.

ECF No. 24-2 ¶ 13.

Hart's role was initially to transition TPI's clients to CPC; later, he became CPC's sole salesperson.  When Hart joined CPC in 2004, CPC's largest shareholders were John T. Bickel Sr. ("Bickel Sr."), Daniel H. LeGear ("D. LeGear"), John Dowell ("Dowell"), and Daniel Moroski ("Moroski") (collectively, "Original Top Shareholders"), none of whom are party to the instant lawsuit; Doug Crowell ("Crowell"), also not a party here, was CPC's CFO and a minority shareholder.

Hart alleges in his verified complaint that in order "[t]o induce Hart to join CPC, its shareholders, directors, officers, and management made specific representations to Hart concerning equity ownership. Specifically, Hart was told he was the only officer without stock but he would be next to receive stock as existing stockholders retired or transitioned stock for succession planning purposes."  Compl., ECF No. 1 ¶ 31.   The Employment Agreement does not reference this alleged promise, and CPC denies it made any such promise.  Defendants have also attached email correspondence between Bickel, Sr. and Hart in 2006, as well as CPC board meeting minutes from March 2007, indicating that CPC had discussed Hart's desire to purchase stock in the company but had decided not to offer Hart stock at that time.  *E.g.*, ECF Nos. 24-4 & 24-5.

**Hart's 2007 Severance Agreement with CPC**

Hart's 2004 Employment Agreement expired by its terms in July 2007, and in August 2007, CPC's board of directors agreed to present Hart with a severance

agreement entitling Hart to certain protections in the event of a sale of the company.  In

connection with these discussions, Bickel, Sr. reported to the board on August 10, 2007,

that Hart "hope[d] to be considered for stock ownership someday in the future and

understands he will have to wait and contribute to earn that right, and he also understands

that we can not make any commitment to stock ownership at this time or in this

Agreement."  ECF No. 24-8.

Bickel, Sr. and Hart subsequently negotiated the terms of a severance agreement.

During these negotiations, Hart emailed Bickel, Sr., requesting him to delete part of a

merger clause in a draft agreement "based on conversations [Hart] had with [Bickel] and

other Board Members regarding [Hart's] future with CPC, especially in regard to the ones

[they] had when [Hart] decided to join CPC."  ECF No. 24-9 at 4.  In response, Bickel,

Sr. responded that the clause included standard language, but that "it appear[ed] from

[Hart's] comment that [Hart] must feel some other commitment was made back in 2004

and [Hart] need[ed] to let [Bickel, Sr.] know specifically what [Hart was] referring to so

[they could] discuss it."  *Id.*  Hart replied the same day that that the clause was "fine as

is" and that their "conversations in '04 did not relate to the severance issues this

Agreement [was] meant to cover"; Hart's reply did not mention any stock sale

commitments.  *Id.* at 3.

CPC and Hart executed the Severance Agreement on October 3, 2007.  According

to Hart, the Severance Agreement "was in lieu of the equity interest that was to be

provided to Hart but that had not yet occurred."  ECF No. 36 at 7.  Like the 2004

Employment Agreement, the Severance Agreement detailed the terms of Hart's

employment benefits and obligations, and it contained the following merger clause: "This

Agreement supersedes all other agreements previously made between the parties relating

to its subject matter. There are no other understandings or agreements."   ECF No. 24-10

at ¶ 10.   The Severance Agreement also provided Hart  with a significant cash payout in

the event of a "change in control" of CPC or termination without cause.  The Agreement

did not reference any commitment or obligation of CPC to sell stock to Hart.

**CPC's Ownership Changes**

Over time, the ownership and leadership of CPC transitioned from the Original

Top Shareholders to Crowell and the Selling Shareholders named in this lawsuit.

Specifically, in 2006, Foltz became an officer and shareholder of CPC.  From 2006 to

2009, Foltz and the other Selling Shareholders (Wallis and Boyich), as well as Crowell,

purchased shares of CPC from the Original Top Shareholders pursuant to the then-

existing Shareholders Agreement.[1]  By 2012, the Original Top Shareholders retired and

sold their remaining shares pursuant to the then-existing Shareholders Agreement to the

Selling Shareholders and Crowell, who became the top shareholders, and to two of the

Buying Shareholders named in this lawsuit, Bickel, Jr. and A.H. LeGear, who became

minority shareholders.

All three Buying Shareholders (Bickel, Jr., A.H. LeGear, and Trower), as well as

---

[1]     The Shareholders Agreement was periodically amended as ownership of the
company changed; however, each version of the Agreement was substantially similar.

non-party, William Steimel ("Steimel"), were named as officers of CPC by 2012.

On June 12, 2015, the CPC board of directors and shareholders passed two consent resolutions allowing Crowell and the Selling Shareholders to sell some of their shares to Trower, Hart, and Steimel, such that Trower, Hart, and Steimel would each acquire a 2.5% equity interest in CPC.  The sale required all of the then-existing shareholders to waive their purchase rights under the then-existing Shareholders Agreement, which they agreed to do.  CPC loaned the purchase money for this transaction to Trower, Hart, and Steimel in the form of a promissory note dated July 1, 2015.  All of the shareholders entered into an amended Shareholders Agreement, effective July 1, 2015, which contained the following merger clause:  "This Agreement constitutes the complete understanding between the parties, all prior representations or agreements having been merged into this Agreement."  ECF No. 24-16 at 18.

Hart alleges that Crowell and the Selling Shareholders also represented to Hart they would "equalize" Hart's ownership with the other minority shareholders, and Hart alleges that these representations are "referred to in contemporaneous emails and board minutes."  ECF No. 8 at 5.  Hart did not attach the contemporaneous emails or board minutes to his complaint or opening brief.  But he did attach some emails from 2013 and 2019 to his reply brief.  *E.g.*, ECF No. 37, Exs. 4 & 5, at pp. 100-105.  These emails between Hart and Crowell in 2013, and between Hart and Wallis in 2019, are the same emails referenced by Defendants in their briefs, regarding Hart's desire to purchase stock and the CPC's board recommendations that Hart be able to purchase stock beginning in

6

2015, though not in equal amounts as other minority shareholders, and that after 2019,

Hart and the other minority shareholders be "equalized in ownership" but cautioning that

this would "require individual [shareholders] to waive their full rights of purchase [under

the then-existing Shareholders Agreement] which is an individual decision."  *Id.* at 104.

According to Hart, each time stock went to other individuals before Hart, Hart raised the

issue with management, he was told that other shareholders had to be addressed first, and

he "accepted the delay patiently and in good faith."  ECF No. 36 at 8.

**Hart's Sales Performance**

According to Defendants, Hart sales performance declined from approximately

2009 through 2019, culminating in a March 13, 2019 board meeting to discuss an

improvement plan.  During that meeting, Hart referenced commitments that had been

made to him regarding stock ownership when he first joined CPC.  When the board asked

Hart for details regarding these commitments, Crowell denied ever having made such

commitments.  Hart vehemently denies any performance issues, and by sworn declaration

and supporting documentation, states that CPC never communicated any performance

issues to him and, instead, praised his performance during the relevant time period.

**2018 Offer by All Minority Shareholders to Buy Out Selling Shareholders**

In the summer of 2018, the Buying Shareholders named here, Hart, and Steimel

discussed an offer to purchase the stock of the Selling Shareholders and Crowell in

proportionate shares.  Hart alleges that in connection with preparing such an offer, in

May of 2018, he prepared a document for the Buying Shareholders suggesting that the

buy-out "equalize" Hart with the Buying Shareholders.[2]  ECF No. 37 at 186.  In that

document, Hart also proposes to exclude Steimel from the purchase offer.

Steimel was ultimately not excluded, and in August of 2018, the Buying

Shareholders, Hart, and Steimel made a formal offer to purchase the stock of the Selling

Shareholders and Crowell.  The offer was for substantially less than the current Proposed

Transaction.  Hart contends that he was concerned at that time that the 2018 offer was too

high, particularly as to Foltz's shares because Foltz was nearing a retirement age that,

under the then-existing Shareholders Agreement, would have given CPC the option to

force a sale of Foltz's shares, potentially using an appraisal process.  Hart believed that

the appraisal would have been for far less money.  In any event, the Selling Shareholders

and Crowell rejected the offer, and the Selling Shareholders indicated at that time that

they wanted several millions more for their shares.  *See* ECF No. 36 at 14.

**Crowell's Retirement and Rescinding of Hart's Severance Agreement**

In April 2019, Crowell announced his plan to retire, and the CPC board arranged

for the sale of Crowell's stock to the other shareholders under the then-existing

Shareholders Agreement.  In July 2019, the CPC board informed Hart that the Selling

Shareholders had decided not to exercise their options to purchase any of Crowell's

shares and that the other shareholders would have the right under the Shareholders

---

[2]     Defendants have moved to strike the document (Hart's Exhibit 16 to his reply
brief) as unauthenticated.  ECF No. 43 In response, Hart has offered a supplemental
declaration purporting to authenticate the exhibit.  As explained to the parties during oral
argument, the Court will deny the motion to strike.  The Court has considered Hart's
Exhibit 16 for what it is worth.

Agreement to purchase their proportionate share of Crowell's stock.

Hart wished to exercise his right under the Shareholders Agreement to purchase his proportionate share of Crowell's stock, and he wished for CPC to loan him money to do so.  The CPC board agreed to loan Hart the purchase money in exchange for his agreement to rescind his Severance Agreement with CPC.  Hart agreed, and on September 20, 2019, following notice and other procedures required by the Shareholders Agreement, Hart purchased his proportionate portion of Crowell's stock in exchange for a promissory note to Crowell for the purchase price.   According to Hart, the other minority shareholders (the Buying Shareholders named in this lawsuit and Steimel) were not required to give anything up in exchange for company loans to buy Crowell's stock.

Following these transactions, as of September 20, 2019 and to date, the ownership of CPC is as follows:

| Shareholder | Shares | Ownership Percentage |
|---|---|---|
| Larry M. Foltz | 4,025 | 20.125% |
| Robert J. Boyich | 4,025 | 20.125% |
| Harold B. Wallis, Jr. | 4,025 | 20.125% |
| John B. Bickel, Jr. | 1,825 | 9.125% |
| A.H. LeGear | 1,825 | 9.125% |
| Duane G. Trower | 1,425 | 7.125% |
| Jeffrey W. Hart | 1,425 | 7.125% |
| William M. Steimel | 1,425 | 7.125% |

Hart did not formally terminate his Severance Agreement until December 10, 2019, and CPC loaned Hart the purchase money on January 2, 2020 to enable Hart to make the first installment payment to Crowell.

**Current Shareholders Agreement**

As a result of the stock ownership changes after Crowell's retirement, the CPC shareholders, including Hart, executed an amended Shareholders Agreement on December 11, 2019 ("Current Shareholders Agreement").  Like previous versions, the Current Shareholders Agreement restricts the sale of CPC stock by prohibiting any shareholder from offering, selling, or transferring any or all of his shares except in compliance with its terms.  ECF No. 24-25.

As relevant here, the Current Shareholders Agreement provides that upon written notice by a shareholder who desires to sell CPC stock, any non-selling shareholder has an option for 60 days to purchase a pro rata portion of the offered stock.  Article I, § A(1) sets forth the requirements for the written notice:

> [A] Shareholder desiring to sell or transfer, in a bona fide transaction, all or any part of the shares owned by him or it shall first given written notice to the Corporation and to the other Shareholders of any such proposed sale or transfer, which notice shall state the name, address and social security number of the proposed transferee (if there is a proposed transferee), the number of shares, and the price, terms of payment, and conditions of such proposed sale or transfer.

*Id.* Art. I, § A.

After the expiration of the 60-day period, if any shares remain, CPC has a 30-day option to buy them.  If none of the aforementioned options is timely exercised, the selling

shareholder may sell the shares as proposed at a price not less than the price specified in the notice of sale.  *Id.*

The Current Shareholders Agreement contains the following choice-of-law and forum-selection clause:  "This Agreement shall be subject to and governed by the laws of the State of Missouri without regard to the conflict of laws principles of Missouri. Further, any action brought to enforce or construe the terms of this Agreement shall be brought *only in the Circuit Court of St. Louis County, Missouri.*"  *Id.* at Art. IV, § G (emphasis added).  The Agreement also contains a merger clause similar to those described above:  "This Agreement constitutes the complete understanding between the parties, all prior representations or agreements having been merged into this Agreement." *Id.* at Art. IV, § D.

## Current Proposal by Buying Shareholders to Buy Out Selling Shareholders

In November 2019 the Buying Shareholders and CPC comptroller, Jon Johanning, who is not a CPC shareholder and is not named in this lawsuit, began negotiating another buy-out offer with the Selling Shareholders.  This time, the Buying Shareholders and Johanning excluded Hart and Steimel from their negotiations.  After a couple months of negotiating, on February 17, 2020, the Buying Shareholders and Johannning made a formal offer ("Proposed Transaction") to purchase the Selling Shareholders' shares. According to Hart, the proposed purchase price was approximately twice the amount that Crowell was paid for his shares when he sold them in September  of 2019, and was higher than what Hart believed Foltz shares would have been worth under the appraisal

process contained in the Shareholders Agreement referenced above.

The Buying Shareholders and Johanning arranged for financing for their offer through CIBC, a third-party bank that, according to Hart, had a banking relationship with CPC.   The third-party bank's lending terms (attached as an exhibit to Defendants' briefs) provide that non-revolving lines of credit are to be collateralized by an assignment and pledge of the CPC stock owned by the Buying Shareholders and Johanning, with cross-default provisions.  ECF No. 24 at 14 & ECF No. 24-27.  No personal guarantees are provided.  The Buying Shareholders contend that in order to obtain the financing, the third-party bank had to assess the value of that collateral and determine that the loan would be adequately secured.  ECF No. 24 at 14-15.  The Proposed Transaction is to be funded with this loan, as well as assumption of the Selling Shareholders' outstanding loan obligations with CPC.

Hart contends that the Buying Shareholders took advantage of CPC's relationship with the third-party bank in order to receive favorable lending terms.  However, at the hearing, the Selling Shareholders denied any involvement in the negotiation of the financing.  And CPC has provided evidence in the form of Wallis's sworn declaration, as a member of CPC's board of directors, that CPC is neither financing the Proposed Transaction nor pledging any assets as collateral for the financing; that the board has not authorized any corporate action by CPC relating to the Proposed Transaction; and that all legal fees incurred by the parties to the Proposed Transaction have been incurred personally and have not been advanced or reimbursed by CPC.  ECF No. 24-34 at ¶ 16.

Pursuant to the Current Shareholders Agreement, on February 26, 2020, each of the Selling Shareholders gave written notice to all of the other CPC shareholders, including Hart, and to CPC of the Proposed Transaction. Each written notice included the name, address, and social security number of the proposed transferees (the Buying Shareholders), the number of shares to be sold (4,025 shares per Selling Shareholder), and the price, terms of payment, and conditions of the proposed sale.  Each written notice also attached a copy of the Buying Shareholders' offer, which indicated that they had obtained a loan from a third-party lender to finance the Proposed Transaction.

This notice triggered Hart's 60-day option period under the Shareholders Agreement.  Hart's option period originally expired on April 27, 2020, but by agreement of the parties in light of the pending motion for a TRO, Hart's option period has now been extended to May 13, 2020.

Hart does not dispute that proper notice was provided or that he was provided an opportunity to purchase his portion of the shares at a price per share that matched the price of the Proposed Transaction, as set forth in the Shareholders Agreement.  However, Hart contends that the option is "futile" because the "artificially high share price" would require him to secure a loan from CPC or from the third-party bank used by the Buying Shareholders and Johanning under the same terms they received, which Hart contends that he is unable to secure.

Hart also faults the Buying Shareholders for not disclosing their negotiations or their financing arrangements with respect to the Proposed Transaction to him until

13

February 26, 2020.  Hart asked the Buying Shareholders for the names of the third-party bankers that they worked with so that Hart could secure a loan under the same terms they had arranged, but the Buying Shareholders refused to provide the contact information and told Hart that the bank would not give Hart such a loan to purchase CPC shares because of a "conflict of interest."

**Hart's Complaint in this Court**

Hart filed suit in this Court on April 17, 2020, pursuant to the Court's diversity jurisdiction.  His Verified Complaint for Derivative, Injunctive, and Other Relief asserts the following claims:  (1) breach of fiduciary duty; (2) a declaratory judgment action requesting a declaration that the individual Defendants have violated the Current Shareholders Agreement by offering to buy and sell shares of CPC "in an undisclosed transaction to a select group of minority shareholders who can access company bank resources for financing to pay an exorbitant amount" (ECF No. 1 ¶¶ 91-92); (3) "Shareholder Oppression," in violation of Mo. Rev. Stat. § 351.850, for acting in a manner that is outside the standards of fair dealing with respect to Hart; (4) promissory estoppel based on Defendants' promises over the years that Hart would receive CPC stock, would be "equalized" with other minority shareholders; and would join the CPC board of directors when other directors retired; (5) and (6) fraudulent misrepresentation and fraudulent inducement, respectively, based on the same false promises; (7) breach of the Severance Agreement, based on Defendants' attempt to terminate the Severance Agreement; (8) breach of the Current Shareholders Agreement; (9) breach of the CPC

bylaws; (10) breach of implied contract based on the alleged false promises noted above; (11) civil conspiracy; (12) breach of the covenant of good faith and fair dealing; and (13) injunctive relief.

Hart seeks injunctive relief to enjoin Defendants from closing on the Proposed Transaction; to require Defendants to provide the number of shares to Hart to equalize his shareholdings with the Buying Shareholders, or alternatively, to require Defendants to purchase Hart's shares on the same terms as offered to the Selling Shareholders and to pay Hart the severance required under the Severance Agreement.   Hart also seeks damages in an amount believed to exceed $10 million, plus punitive damages and attorneys' fees.

**Motion for TRO**

In his motion for a TRO, Hart seeks to enjoin the Proposed Transaction for more than two months, until July 21, 2020, when the Court anticipates holding a hearing on any forthcoming motion for preliminary injunction.[3]  Hart focuses his motion for a TRO on only two of his claims: breach of fiduciary duty and breach of the Current Shareholders Agreement.  Hart argues that he is likely to succeed on the merits with respect to both claims.

Hart contends that he will suffer irreparable harm if a TRO is not granted because he will lose the opportunity to purchase the stock at issue, which Hart maintains is unique

---

[3]     Hart has submitted a proposed order in connection with his motion that seeks much more extensive relief, but at oral argument, he limited his request.

in character and lacks an efficient market for purchase and sale.  Hart argues that if allowed to proceed, Defendants actions "will substantially dilute Hart's percentage share and equity interest in the company, with control of the company given to a favored group, all to his substantial detriment."  ECF No. 36 at 1.  Further, Hart argues that the balance of equities and public interest tip in his favor because he has been a loyal employee of CPC for 15 years, Defendants should be held to their past promises, and Defendants will not be damaged by a delay in the closing of the Proposed Transaction because CPC stock has no readily available marketplace.  Finally, Hart requests that the bond requirement under Federal Rule of Civil Procedure 65(c) be waived or a nominal amount, which at the hearing he asserted should not exceed $75,000.

## DISCUSSION

### Legal Standard

In determining whether to issue a TRO, the Court must consider four factors: (1) the threat of irreparable harm to the movants; (2) the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movants will succeed on the merits; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  "While no single factor is determinative, the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted).  To demonstrate a probability of success on the merits, the movant must show a "fair chance of prevailing."  *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019).

"This fair-chance standard does not require the party seeking relief to show a greater than fifty per cent likelihood that he will prevail on the merits."  *Id.* (internal quotations and citations omitted).  However, the party requesting injunctive relief bears the "complete burden" of proving that an injunction should be granted.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**Likelihood of Success**

As an initial matter, as the Buying Shareholders assert in their opposition brief, the mandatory nature of the forum-selection clause in the Current Shareholders' Agreement, directing that "any action brought to enforce or construe the terms of this Agreement shall be brought only in the Circuit Court of St. Louis County, Missouri," ECF No. 24-25, at Art. IV, § G, certainly undermines Hart's attempt to show a likelihood of success on his contract claim.  *See Consul Grp. Re Dos Mil Veintiuno Sociedad De Responsabilidad Limitada v. Zinchenko*, No. LACV19-01254JAK (Ex), 2019 WL 2610963, at *2 (C.D. Cal. Apr. 15, 2019) (denying a TRO in part because, "as to likelihood of success on the merits, Plaintiff has not carried its burden to show that . . . the action should not be dismissed on the basis of forum non conveniens due to the potential applicability of a forum-selection clause identified in the opposition briefs").  Likewise, the forum-selection clause would seem to apply to Hart's breach of fiduciary duty and other non-contract claims which, if not subsumed by his contract claim (as discussed below), are at least closely related to that claim.  *See Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 695 (8th Cir. 1997) (holding that strategic or

artfully drawn pleadings . . . will not work to circumvent an otherwise applicable forum selection clause," and that such a clause may apply to tort or other non-contract claims where such claims depend on the existence of a contractual relationship, relate to interpretation of the contract, or involve the same operative facts as a parallel breach of contract claim).

Although Defendants have not yet sought dismissal on the basis of forum non conveniens, at this stage, it appears that such a motion may be well taken.  *See, e.g.*, *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 60-61 (2013) (holding that forum-selection clauses pointing to a state or foreign forum should be decided through the doctrine of forum non conveniens and that "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases") (citations omitted).

Nevertheless, as the Court explained during the hearing and as the parties agreed, the Court is willing to rule on the motion for a TRO, notwithstanding the forum-selection clause, because the motion came to this Court on an emergency basis, and the undersigned was not initially aware of the clause; because the parties agreed to a standstill agreement based on part on the undersigned's schedule in light of the current coronavirus (Covid-19) pandemic; and because it would prejudice the parties to delay addressing the matter as scheduled, particularly when it may be equally difficult to get a hearing on an emergency basis in state court in light of the pandemic.  At the hearing, the

parties agreed, following issuance of this Memorandum and Order, to brief the effect of the forum-selection clause on any further proceedings in this Court.

I.      Breach of the Current Shareholders Agreement

Looking beyond the forum-selection clause to the merits of Hart's claims, Hart argues that Defendants breached the Current Shareholders Agreement by not timely disclosing the Proposed Transaction to him; not disclosing the financing arrangements with the third-party bank; and exaggerating the share price of CPC shares such that the Proposed Transaction is not a "bona fide transaction" under the Shareholders Agreement.

The parties' agree that Missouri law governs Hart's breach of contract pursuant to the Current Shareholders Agreement's choice-of-law provision.  To prevail on a breach of contract claim under Missouri law, a plaintiff must demonstrate (1) the existence and terms of a contract; (2) that the plaintiff performed or tendered performance of the contract; (3) a breach of the contract by defendant; and (4) resulting damages.  *Keveney v. Missouri Military Acad.,* 304 S.W.3d 98, 104 (Mo. 2010).

On this record, the Court concludes that Hart has not made a sufficient showing that Defendants breached the Current Shareholders Agreement.[4]   By Hart's own admission, the Selling Shareholders provided Hart notice and the option to purchase the subject shares (which option is still pending) in accordance with the Agreement's terms.

_____

[4]      At oral argument, Hart's counsel indicated that he is also asserting a breach of the implied covenant of good faith and fair dealing.  Hart has not shown a likelihood of success of prevailing on such a theory either, as Hart has not provided any legal authority that the implied covenant would apply in the manner Hart alleges.

To the extent Hart's argument is that Defendants did not disclose their negotiations prior to issuing formal notice of the Proposed Transaction, or did not disclose their financing arrangements, Hart has not shown that any express or implied provision of the Current Shareholders Agreement requires such disclosures.

Hart's main argument is that the Proposed Transaction itself is not a "bona fide transaction" under the Agreement. Hart bases this argument primarily on his belief that the proposed purchase price is too high. But Hart has not offered anything beyond speculation to support his belief. Hart's evidence rests on the price of shares sold by a single minority shareholder (Cromwell) several months earlier. And Hart concedes that the Selling Shareholders were unwilling to sell their shares at a lower price (a price that Hart still thought was too high) just a year and a half earlier, in August 2018. The fairness of the share price is also supported by the fact that an independent third-party lender is willing to loan fonds for the purchase taking only CPC stock as collateral. That the selling parties wanted to maximize their return and the buying parties wanted to maximize their stake in the company or that some of the buying parties had a familial connection to CPC, as Hart notes in his reply brief, is hardly unusual, particularly of a company with so few shareholders. Without more, Hart simply has not presented sufficient indicia that the Proposed Transaction is not a bona fide transaction.

II.     Breach of Fiduciary Duty

With respect to his breach of fiduciary duty claim, Hart asserts that Defendants owe him an elevated fiduciary duty as a minority shareholder in a closely-held

corporation, and Defendants breached that fiduciary duty by: failing to adhere to the

"equalization" promises they made to Hart; failing to timely disclose the terms of the

Proposed Transaction to Hart; and failing to provide Hart with any contact information

for the third-party bankers or to make low-interest company loans available to Hart in

accordance with past company practice.[5]

Under Missouri law, which the parties agree applies here, "the fiduciary duty of a

director or officer of a corporation is generally held to be between the directors and the

shareholders as a whole.  In other words, fiduciary duty obliges corporate officers and

directors to act in the best interests of all shareholders on a collective basis."  *Nickell v.*

*Shanahan*, 439 S.W.3d 223, 227 (Mo. 2014) (citations omitted).

Hart has not made a sufficient showing that the Proposed Transaction implicates

any fiduciary duty owed by Defendants.[6]  The source of the obligations Hart alleges are

owed by Defendants is, for the most part, contractual rather than fiduciary in nature.  *See*

---

[5]     In his briefs, Hart also asserted a derivative breach of fiduciary duty on behalf of
the corporation, arising from exaggerating the share price in the Proposed Transaction,
which, according to Hart, would create corporate waste.  However, at oral argument,
Hart's counsel stated that the current motion for TRO was not based on any such
derivative claims.

[6]     Although Hart alleges his breach of fiduciary duty claim against all Defendants,
including the corporation itself, his assertions focus the director Defendants and those
whom he describes as "majority" shareholders (the Selling Shareholders), none of whom
owns a majority of CPC's shares.  Hart's counsel admitted at oral argument that he has
no legal authority for imposing a fiduciary duty on his fellow minority shareholders in
their capacity as minority shareholders.  If there were such a duty, Hart himself breached
it in May of 2018, when he tried to exclude Steimel from his offer to buy out the Selling
Shareholders.

*Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 905 (Mo. 1990) ("[T]he failure to distinguish between contractual obligations that arise by virtue of the agreement and fiduciary duties that arise as a result of the [plaintiffs'] status as shareholders permeates the [plaintiffs'] analysis of this case.").

Hart provides no legal authority for imposing a fiduciary duty on officers, directors, or shareholders to "equalize" minority shareholders; rather, Hart alleges the duty arises from promises first made to him by CPC 16 years ago.  The cause of action to enforce such a promise is breach of contract or, perhaps, promissory estoppel, against CPC, but not breach of fiduciary duty against the individual Defendants.

Even if the Court were to construe Hart's claim in this respect as a breach of contract or promissory estoppel claim against CPC,[7] Hart has not demonstrated a likelihood of success in proving that CPC made him such a promise, let alone what that promise was or when it occurred; that such promise was sufficiently definite to be enforceable; that such promise was supported by consideration or reasonable, detrimental reliance; or that such promise, which was admittedly first breached many years ago and is not contained in any of the apparently integrated written contracts, may be enforced now.[8]  At this stage, Defendants' arguments on these points are more persuasive.

---

[7]     Although Hart alleges such claims in his complaint, his motion for a TRO is focused only on his claims alleging breach of the Current Shareholders Agreement and breach of fiduciary duty.

[8]     By his own admission, the 2007 Severance Agreement "was in lieu of the equity interest that was to be provided to Hart but that had not yet occurred."  ECF No. 36 at 7.

More importantly, Hart has not demonstrated that a TRO to enjoin the Proposed Transaction is an appropriate remedy with respect to claims based on any such promise. Indeed, Hart's counsel admitted at oral argument that, even had Hart been "equalized" to certain other minority shareholders, he would not be in any better position to stop the Proposed Transaction or to exercise his option to participate in the Proposed Transaction. In short, the Proposed Transaction appears to be unrelated to Hart's claims regarding any "equalization" promise.

Likewise, Hart has not provided any legal authority for imposing a fiduciary duty on Defendants here to have disclosed the terms of the Proposed Transaction before those terms were finalized or to have disclosed the Buying Shareholders' financing arrangements.  From the Court's review at this stage, it appears that the source of any disclosure obligation in this context is the Current Shareholders' Agreement and that Defendants fulfilled that obligation.  *See id.* (holding that claims challenging a majority shareholder's failure to make full disclosure to minority shareholders with respect to a stock purchase, where the parties had entered into a stock restriction agreement "emanate[d] from obligations imposed by the contract, not from a duty owed the [plaintiffs] as shareholders.").  To the extent Hart is claiming that the shareholders involved in the Proposed Transaction somehow used their position at CPC to assist in the

---

Hart thereafter agreed to cancel the Severance Agreement in 2019 in exchange for CPC's agreement to loan him the funds to purchase Crowell's shares.

financing of the transaction, Hart has not offered any evidence in support of such a claim, and the limited evidence at this stage weighs against that claim.

For all of these reasons, Hart has not demonstrated a sufficient likelihood of success on the merits as to his claims asserting breach of the Shareholders Agreement and breach of fiduciary duty.  Hart has not addressed the complaint's remaining counts in the motion for a TRO, so the Court will not address them either.

**Irreparable Harm**

Hart has also failed to demonstrate irreparable harm.  Hart still has the option to purchase his proportionate share of the subject stock at a price per share that matches the Proposed Transaction.  And although Hart speculates that he lacks financing to exercise that option, his counsel admitted at oral argument that he has no evidence that Hart has attempted to secure such financing, from CPC, CIBC, or any other source.

As to Hart's claim of "dilution" of his equity interest in CPC, Hart has conceded that, if the Proposed Transaction closes, his equity interest would remain at 7.125%.  In his reply brief, Hart asserts that the closing of the Proposed Transaction would dilute his ownership interest by virtue of further concentration of shareholder power among the top shareholders.  Specifically, Hart argues that CPC currently has eight shareholders, with the top four shareholders owning 69.5% of the company.  But if the sale goes through, CPC will have six shareholders with the top four shareholders owning 87.75% of the company.

But this assertion of irreparable harm also falls short.  This is not a case involving a majority shareholder attempting to increase his power or squeeze out a minority shareholder.  There is no single majority shareholder in CPC and there still would not be even if the Proposed Transaction is completed.  Hart's counsel admitted at oral argument that his "dilution" theory would require a showing that some or all of the shareholders would always vote as a group, something that – even if sufficient to constitute dilution – Hart has not sufficiently shown at this stage.

**Balance of Harms and Public Interest**

Weighing against Hart's failure to show irreparable harm is Buying Shareholders' assertion that they risk losing their financing if the Proposed Transaction is delayed.  Although the Buying Shareholders have not provided strong evidence of the extent of such a risk, the terms of their loan contemplate a closing consistent with the Current Shareholders Agreement, which has set time frames.[9]  The balance of harms thus weighs at least slightly in favor of denying the motion for a TRO.

As for the public interest, as usual, this factor favors neither party strongly when considered in isolation.  The public interest favors enforcement of contracts and fiduciary

---

[9]       Moreover, if the Court were to grant a TRO, it would require a sizeable bond to protect Defendants against damages sustained if wrongfully enjoined or restrained.  *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").  Hart indicated at oral argument that he was prepared to post a bond of no more than $75,000, which the Court finds insufficient.

duties, and, accordingly, favors the side likely to succeed on the merits on these claims. Here, the public interest favors denying the motion for a TRO.

## CONCLUSION

On balance, Hart has not met his burden of proving that a TRO should be granted. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for a temporary restraining order is **DENIED**. ECF No. 5.

**IT IS FURTHER ORDERED** that Defendants' motion to strike is **DENIED**. ECF No. 43.

**IT IS FURTHER ORDERED** that Defendants shall have until **Friday, May 15, 2020 at 5:00 p.m.** to file any applicable motion to dismiss based on the forum-selection clause at issue in this case.  Plaintiff's response shall be due no later than **seven days** after the motion is filed, and any reply shall be due no later than **seven days** thereafter.

**IT IS FURTHER ORDERED** that the parties shall confer and attempt to reach agreement with respect to the deadline for Defendants' responses to the complaint, and shall promptly file any appropriate motion for extension of that deadline.

**IT IS FURTHER  ORDERED** that, in accordance with the Case Management Order (ECF No. 17), no later than **June 1, 2020**, the parties shall schedule a mediation conference with their chosen neutral, Mr. Stephen Rovak. The parties shall complete mediation by **June 30, 2020**.  The parties shall promptly file a notice advising the Court of the date and time of the mediation conference.  The conference(s) shall be conducted

in accordance with the procedures outlined in E.D.Mo. L.R. 6.01 - 6.05, as modified by the Administrative Order of Chief Judge Sippel dated March 18, 2020.  Pursuant to that Order, the Court suspended all requirements related to in-person participation in Alternative Dispute Resolution (ADR) under Local Rule 6.02(C) in order to allow for ADR to take place by any remote means agreed upon by the parties.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 13th day of May, 2020.